1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

KIND LAW
8860 South Maryland Parkway, Suite 106
Las Vegas, Nevada 89123

# EXHIBIT 9

CONFIDENTIAL

1              UNITED STATES DISTRICT COURT

2                  DISTRICT OF NEVADA

3

4    PAUL TUTTOBENE,

5              Plaintiff,

                                    Case No.:

6    vs.                            2:19-cv-01999-APG-NJK

7    TRANSUNION, LLC, et al.,

8              Defendants.

     _____/

9

10

11

12

            CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER

13                VIRTUAL ZOOM/TELEPHONIC

        FRCP 30(b)(6) DEPOSITION OF TRANSUNION, LLC,

14            REPRESENTED BY NIKISHA KIMP

15            Thursday, August 27, 2020

16            Philadelphia, Pennsylvania

17

18

19

20

21

22   Reported by:

     Michelle C. Johnson, RPR-CRR

23   NV CCR 771, CA CSR 5962

24   Job No. 4231509

25   Pages 1 - 301

                                          Page 1

1        BE IT REMEMBERED that, pursuant to the laws
    governing the taking and use of depositions remotely,
2    and on Thursday, August 27, 2020, commencing
    at 1:05p.m. EDT thereof, in Philadelphia, Pennsylvania,
3    by way of virtual Zoom/telephonic appearance, before
    me, MICHELLE C. JOHNSON, a Certified Court Reporter in
4    the States of Nevada and California, virtually
    appeared NIKISHA KIMP, called as a witness by the
5    Plaintiff.
6    VIRTUAL ZOOM/TELEPHONIC APPEARANCES:
7    For the Plaintiff:
8        MICHAEL KIND
        Attorney at Law
9        KIND LAW
        8860 South Maryland Parkway
10        Suite 106
        Las Vegas, Nevada 89123
11        702.337.2322
        mk@kindlaw.com
12

    For Defendant TransUnion, LLC:
13
        JUSTIN SAULS
14        AMANDA P. LOUGHMILLER
        Attorneys at Law
15        QUILLING, SELANDER, LOWNDS, WINSLETT & MOSER, PC
        6900 North Dallas Parkway
16        Suite 800
        Plano, Texas 75024
17        214.871.2100
        jsauls@qslwm.com
18        aloughmiller@qslwm.com
19
20
21
22
23
24
25

                                    Page  2

CONFIDENTIAL

```
 1                        INDEX
 2    WITNESS
      NIKISHA KIMP
 3                                             PAGE
 4        Examination by Mr. Kind                5
 5        Examination by Mr. Sauls             255
 6
 7
 8                       EXHIBITS
 9    NUMBER                                   PAGE
10    PLAINTIFF'S
11    Exhibit 1      Second amended deposition notice    151
12    Exhibit 2      Annual Credit Report Request Form,   151
                     with attachments (TU 1-147)
13
      Exhibit 3      4/2/2019 Documents Acceptable for    227
14                   Maintenance (TU 148-174)
15    Exhibit 4      6/21/2019 Consumer Disputes          236
                     (CONFIDENTIAL TU 175-231)
16
      Exhibit 5      2/2012 TransUnion Data Furnishers    241
17                   Reporting Agreement
                     (CONFIDENTIAL 276-286)
18
      Exhibit 6      6/11/2019 Certified Mail Labels.com  243
19                   Receipt (Tuttobene - Plaintiff's 25)
20    Exhibit 7      8/13/2019 Certified Mail Labels.com  243
                     Receipt (Tuttobene - Plaintiff's 26)
21
      Exhibit 8      2/24/2020 TransUnion credit report   243
22                   (12 pages)
23    TRANSUNION
24    Exhibit Def 1  4/2/2019 and 6/21/2019 Documents     256
                     Acceptable for Maintenance
25                   (CONFIDENTIAL TU 148-231)
```

                                                Page  3

CONFIDENTIAL

```
 1                        EXHIBITS
                        (CONTINUED)
 2
       NUMBER                                          PAGE
 3
       TRANSUNION
 4
 5     Exhibit Def 2  Annual Credit Report Request Form,    256
                      with attachments (TU 1-147)
 6     Exhibit Def 3  4/10/2018 Consumer Disputes           257
                      (CONFIDENTIAL TU 232-286)
 7
       Exhibit Def 4  AUD from New American Funding          257
 8                    (TU 287)
 9
10
11
12                INFORMATION TO BE SUPPLIED
13                         (None)
14
15
16                INSTRUCTIONS NOT TO ANSWER
17                     PAGE    LINE
18                  1)    35     12
19                  2)   123     16
20                  3)   249     12
21
22
23
24
25
```

                                            Page  4

CONFIDENTIAL

```
 1              (Due to the need for this deposition to take
 2    place remotely, the parties stipulated that the court
 3    reporter may swear in the witness over the
 4    phone/virtual videoconference and that the witness has
 5    verified that she is in fact Nikisha Kimp.)
 6                        NIKISHA KIMP,
 7    being first virtually duly sworn to tell the truth,
 8    the whole truth, and nothing but the truth, was
 9    examined and testified as follows:
10                        EXAMINATION
11    BY MR. KIND:
12        Q.  Good morning.
13        A.  Good morning.
14        Q.  Could you please state your name --
15              MR. SAULS:  I apologize, Mr. Kind; I'm
16    certainly not trying to interrupt your thought.  I
17    just want to state for the record, I'm in a conference
18    room, and Amanda Loughmiller, is in the same
19    conference room with me.  She's not making objections
20    or doing any of that level of participation in the
21    deposition.  But just to be clear for the record.
22              THE REPORTER:  Thank you.
23              MR. KIND:  Appreciate that.
24        Q.  So, Ms. Kimp, I was just going to ask you
25    just to say your name for the record.
```

Page 5

```
 1          A.   Nikisha Kimp.

 2          Q.   Right now you're remote.  Are you together

 3   with anyone else in your room?

 4          A.   No, I'm home alone.

 5          Q.   And where is home?  Not the actual address,

 6   just the city and state.

 7          A.   Philadelphia, Pennsylvania.

 8          Q.   Got it.  All right.  Could you tell me

 9   generally what you did to prepare for today's

10   deposition?

11          A.   I reviewed the exhibits and discussed them

12   with my attorney.

13          Q.   Understood.  By "the exhibits," do you mean

14   the credit reports, investigation results for

15   Mr. Tuttobene?

16          A.   Yes.

17          Q.   Okay.  Did you also review any policies and

18   procedures?

19          A.   Yes.

20          Q.   Did you also review documents that were

21   received from New American Funding?

22          A.   Yes.

23          Q.   For this deposition, is it okay if I refer to

24   New American Funding as NAF?

25          A.   Yes, that's fine.
```

Page 6

1       Q.   Okay.

2            MR. SAULS:  And, Mr. Kind, again, I beg your

3    pardon.  Before we get too far into it, if you and I

4    could have a discussion on how we're going to conduct

5    everything to make sure that we link up, that we don't

6    have any differences of opinion.  Or if you're

7    planning to do that, then I apologize for interrupting

8    you.

9            MR. KIND:  I'm not sure what you have in

10   mind.

11           MR. SAULS:  I'll just say a couple of pieces.

12   With respect to objections, if I object to a question

13   being beyond the scope of the notice, obviously my

14   client will go ahead and answer.  But for the purposes

15   of the record, that answer will be based upon her

16   personal knowledge to the extent that the particular

17   question extends past the scope.  And, you know, we'll

18   be -- so anyway, just wanted to clarify with that.

19           And then also, I sent you some documents

20   yesterday and I'm not sure where we left off on that.

21   We can discuss it on the record; we could go off of

22   the record.  You know, I plan to introduce at least

23   one of those documents as an exhibit, if you don't.

24   But, you know, if there's a challenge or an issue with

25   that, I'd love to get it out of the way at the outset,

Veritext Legal Solutions
866 299-5127

1   reinvestigation procedures.  So my client sent two for

2   this case; there was one in June and one in August.

3   Do you remember seeing that?

4        A.  Yes.

5        Q.  Were both -- for both reinvestigations, did

6   they both follow the same general procedures for

7   handling the disputes?

8        A.  Yes.

9        Q.  Could you tell me the general procedure

10   TransUnion follows to handle a consumer dispute?

11        A.  Well, um (inaudible).

12             (Reporter clarification.)

13             THE WITNESS:  Well, what we do is once we get

14   a letter or a dispute from the consumer, it goes to

15   our imaging department, and they image it or scan it,

16   and they send the document to a representative for

17   processing.

18             The representative reviews the document, they

19   pull an internal disclosure so they can see what's on

20   the file.  They review the account and review any

21   attachment to the correspondence to see if there is

22   something that TransUnion can do manually themselves.

23             If there is not anything that TransUnion can

24   do manually to update the account, the lead account,

25   or change the account, we send an investigation, or

Page 42

1    CDV, to the data furnisher along with all the relevant

2    information, and the data furnisher reviews the

3    information and they send the response.  And once we

4    get the response, we send the response to the

5    consumer.

6    BY MR. KIND:

7        Q.  I notice that after -- we'll start at the

8    end.  I notice that after -- you mentioned that after

9    the ACDV response is received, there was no additional

10   investigation by TransUnion.  Is that right, or does

11   TransUnion review the ACDV response and then review it

12   again?

13       A.  Well, the ACDV response is electronic.  We do

14   our review initially before we send the CDV, and then

15   once the CDV comes back, we generate the results and

16   send it on the consumer.

17       Q.  Once the ACDV comes back, is that processed

18   automatically, or does it have a manual review to send

19   it back to the consumer?

20       A.  Mostly, it's automatic.

21       Q.  You said "mostly."  Could you clarify what

22   you mean?

23       A.  It's a system, so sometimes things come back

24   where a person has to review it.  Maybe somebody

25   didn't enter the right code or something like that and

Page 43

1    someone has to manually process the ACDV.

2         Q.   Are you able to tell -- based on the

3    documents you reviewed for today's deposition, are you

4    able to tell if it was reviewed manually in this case

5    after the ACDV responses came back?

6         A.   Yes, it was not.  Automatic.

7         Q.   So let's go back to the beginning part.  You

8    said "imaging," I think that seemed to be the first

9    process when the consumer dispute comes in.  Could you

10   tell me what "imaging" is?

11        A.   It's our mailroom.

12        Q.   Okay.  And by "imaging," do you mean it gets

13   scanned in to an electronic file?

14        A.   Correct.

15        Q.   And then it goes to -- you said it goes to

16   processing after imaging?

17        A.   Yes.

18        Q.   What happens in the processing stage?

19        A.   It's just sent for processing.  It sits there

20   and waits for someone to process it, to look at it or

21   review it.

22        Q.   Is that a manual process?

23        A.   Yes.

24        Q.   Does TransUnion have employees in-house that

25   handle that processing?

Page 44

CONFIDENTIAL

1      A.  Yes.

2      Q.  Okay.  In this case, was Mr. Tuttobene's

3  disputes, either one or both, handled by TransUnion

4  employees?

5      A.  No, they were handled by Intelenet, our

6  third-party vendor.

7      Q.  Where is Intelenet based?

8      A.  India.

9      Q.  Does TransUnion have policies and procedures

10  and manuals that Intelenet is supposed to follow while

11  completing the processing stage of reviewing a

12  consumer dispute?

13          MR. SAULS:  Objection, beyond the scope of

14  the notice of the deposition.

15          You can answer.

16          THE WITNESS:  Yes.

17  BY MR. KIND:

18      Q.  What's the name of that policy or procedure?

19          MR. SAULS:  Same objection.

20          THE WITNESS:  I guess in this case, it would

21  be the dispute -- dispute policy.

22  BY MR. KIND:

23      Q.  Okay.  So TransUnion doesn't have an

24  additional policy that's specifically for Intelenet;

25  is that right --

Page 45

1          MR. SAULS:  Same objection.

2    BY MR. KIND:

3        Q.  -- for disputes?

4          MR. SAULS:  Same objection.  Sorry.

5          THE WITNESS:  Not that I'm aware of.

6    BY MR. KIND:

7        Q.  So either way, if it was handled by an

8    internal TransUnion employee or Intelenet, they would

9    still follow the exact same policies, which is the

10   TransUnion consumer dispute policies, right?

11       A.  Yes.

12       Q.  Did you speak to anyone at Intelenet in

13   preparing for today's deposition?

14       A.  No.

15       Q.  Why not?

16       A.  I don't know how to answer that question.

17   That wasn't part of my preparation with my attorney.

18       Q.  Do you think that you would be able to have

19   any more information about the disputes relevant in

20   this case if you had spoken to anyone at Intelenet?

21          MR. SAULS:  Objection, calls for speculation.

22          THE WITNESS:  Can you repeat that?  Sorry.

23   BY MR. KIND:

24       Q.  Yeah.  You said you didn't speak to anyone at

25   Intelenet.  And I'm asking is the reason that you

                                        Page 46

CONFIDENTIAL

1   didn't speak to them because you wouldn't have gained

2   any additional information, you can access all the

3   information from the data you already have.  Is that

4   right?

5           MR. SAULS:  Objection, beyond the scope of

6   the notice of the deposition.

7           THE WITNESS:  Yes, that's correct.

8   BY MR. KIND:

9       Q.  Okay.  The next step you had mentioned was to

10  pull internal disclosures -- correct me if I'm

11  wrong -- can you tell me what that means?

12      A.  We pull internal disclosures.  So we will go

13  in and look at the consumer's report and locate the

14  account that's being disputed and we'll the review it.

15      Q.  Is there something in particular that they

16  are reviewing inside the disclosure?

17      A.  Reviewing the account and the status of the

18  account or whatever the dispute is in the report.  We

19  check the name, make sure that we're, you know -- make

20  sure that we're picking or -- picking the correct

21  file, locating the correct file to dispute the

22  information.

23      Q.  Does -- in TransUnion's system, if -- it

24  sounds like they have to actually pull a disclosure to

25  get a full report on a person as opposed to there is

Page 47

CONFIDENTIAL

1  constantly a report there that you could just look at.

2  I don't know if you understand what I'm saying or if

3  that's correct.

4         MR. SAULS:  Objection, ambiguous.

5  BY MR. KIND:

6     Q.  Did you understand my question?

7     A.  Yes, I understand.

8         So, yes, so there is no continual report; you

9  have to actually pull the report to view it.

10    Q.  Understood.  And then could you tell me

11 about, once the disclosure is pulled, we're still --

12 it's still in the processing department, right?

13    A.  Yes.

14    Q.  Okay.  And then at this point, you mentioned

15 that they review the account and review attachments.

16 Could you tell me what are they reviewing and how

17 they're reviewing this?

18    A.  Well, they're reviewing the account to match

19 up with what the consumer is saying.  So in this case,

20 he was saying that he was not late.  So they would

21 review the account to see where he's late at, what's

22 he disputing.  And we'll look at that, and then we

23 will look at any documents that the consumer sent in

24 to see if there was something to support the dispute

25 in order for us to change it or delete it.

Veritext Legal Solutions
866 299-5127

1      Q.  As far as determining -- wait, let me start

2   that again.

3          After that reviewing process, then the --

4   what's the name of the -- what's the title of the

5   person that does this; do they have a name, like a

6   processing person?

7      A.  I would just say a representative.

8      Q.  Okay.  Is it is a specific department to

9   review these disputes?

10      A.  Consumer operations.

11      Q.  Okay.  But customer operations also handles

12   other things that are not disputes, right?

13          MR. SAULS:  Objection to the extent it

14   misstates prior testimony.

15          THE WITNESS:  As far as I know, they only

16   handle disputes: telephone disputes and written

17   disputes.

18   BY MR. KIND:

19      Q.  If a consumer comes in and just wants to buy

20   their credit report or credit score, which department

21   do they speak to?

22      A.  It's --

23          MR. SAULS:  Objection, not contained in the

24   notice of the deposition.

25          THE WITNESS:  That would be consumer

Page 49

1    operations also.

2    BY MR. KIND:

3        Q.   Okay.   So consumer operations handle that,

4    but they also handle this dispute process that we're

5    talking about now, correct?

6        A.   Yes.   They're basically customer service.

7        Q.   Understood.   Customer service including this

8    dispute process, correct?

9        A.   Right.

10       Q.   And it would still be the same

11   representatives at Intelenet that handle generally the

12   customer service too, right?

13           MR. SAULS:   Objection, outside of the scope

14   of the notice of the deposition.

15       A.   Well, they have different people that does

16   different things, but they're all consumer operations,

17   if that makes sense.   So they have people who talk on

18   the telephone and then they have people who process

19   written disputes.   But it's all under customer

20   service.

21   BY MR. KIND:

22       Q.   Do you know how many representatives they

23   have -- that TransUnion has, including those at

24   Intelenet or some other company -- how many people

25   they have handling consumer disputes?

Case 2:19-cv-01999-APG-NJK  Document 29  Filed 10/07/20  Page 18 of 86
CONFIDENTIAL

MR. SAULS:  Objection, beyond the scope of
the notice of the deposition.
THE WITNESS:  No, I don't know that.
BY MR. KIND:
Q.  More than 100?
MR. SAULS:  Same objection.
THE WITNESS:  I would say it's more than 100.
BY MR. KIND:
Q.  Is it more than a thousand?
MR. SAULS:  Same objections.
THE WITNESS:  I don't -- I don't know.
BY MR. KIND:
Q.  Okay.  All right, so they review the account,
they review the attachments, and then the
representative is able to make a determination at that
point; is that right?
A.  Yes, they're able to decide what they need to
do to go further.
Q.  Does -- do the representatives have any
discretion to believe or not believe a consumer and
what he's saying in his dispute?
MR. SAULS:  Objection, calls for speculation.
THE WITNESS:  No, there's no discretion.  We
have to follow the policies and procedures as they are
written.

Page 51

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL

1    BY MR. KIND:

2         Q.  So, for example, we'll get to this later, but

3    there are specific dispute codes.  Do you know what

4    I'm talking about?

5         A.  Yes.

6         Q.  So is it a TransUnion policy that the

7    representative must pick one of the codes?

8         A.  Well, in order to dispute, you have to at

9    least pick at least one.

10        Q.  But is there a code that's, like, other,

11   doesn't fit in the other disputes, in the other codes,

12   something like that, and then they can manually

13   process it because it doesn't fit into one of the

14   codes?

15        A.  Yeah, we have a code that we can use for if,

16   you know, it's not clear or we're not clear about what

17   the dispute is.  We have a code that we can use for

18   other so that we can send the information to the

19   creditor.

20        Q.  And then in this case, they would manually

21   type in what the dispute is?

22        A.  Well, that's a -- they don't have to.  You

23   know, they'll attach the image or attach their

24   documents and send them to a data furnisher in that

25   case.

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL

1    Q.  Before we get to sending to the furnisher,

2    the data furnisher, I'd still like to talk a little

3    bit more about TransUnion's internal investigation

4    before it goes to the data furnisher.

5         For example, let's say a dispute comes in and

6    it doesn't fit one of the dispute codes, but the

7    representative says, "Hey, this is a really good

8    dispute, it doesn't fit with one of these, I agree

9    with it," do they have a way to click something and

10   update the information if it doesn't fit within the

11   dispute codes?

12        MR. SAULS:  Objection, compound, and calls

13   for speculation.

14        THE WITNESS:  The only way that we could

15   correct information is if we receive supporting

16   documents.

17   BY MR. KIND:

18   Q.  I see.  So that's helpful.  So TransUnion

19   will never update or delete information unless there

20   are supporting documents; is that right?

21        MR. SAULS:  Objection, calls for speculation.

22        THE WITNESS:  Well, I can't say never because

23   there are things in place where things do get deleted

24   without supporting documents, or updated.

25   BY MR. KIND:

Veritext Legal Solutions
866 299-5127

```
1        Q.  Can you tell me what those scenarios are?
2            MR. SAULS:  Objection, calls for narrative.
3            THE WITNESS:  I can't pinpoint anything right
4   now.  I just know that there are cases that our system
5   will make the update based on a dispute or a claim.
6   BY MR. KIND:
7        Q.  And is that based on information that the
8   representative types in or is that based on a code
9   that the representative enters?
10           MR. SAULS:  Same objection.
11           THE WITNESS:  That would be based on a code
12  that a representative enters.
13  BY MR. KIND:
14       Q.  Okay.  So --
15           MR. SAULS:  Mr. Kind, I don't want to
16  interrupt you.  We've been going about an hour and a
17  half.  Is there a break on the horizon?  Or certainly
18  whenever it's comfortable for you, we're happy to do
19  that.
20           MR. KIND:  Anytime.  If you want to break
21  right now, we can.  How long are you looking to take?
22           MR. SAULS:  Look, if you don't want to take
23  one at this juncture, that's fine, but we could
24  probably take -- whenever you're ready to break, we
25  could do a ten-minute break if you'd like.  But I'm
```

Page 54

1   not needing a right break now, if you would like to --

2   whenever we get to that point, ten minutes I think

3   will work for us.

4         MR. KIND:  Sure.  We could take a ten-minute

5   break now.  It's up to you; I'm good to continue.

6         MR. SAULS:  We'll go ahead and continue.

7         MR. KIND:  Just let me know when you need to

8   take a break.  Court reporter as well, please just let

9   me know.

10         THE WITNESS:  Since we're talking about

11   breaks, let's take one right now.  I need the

12   restroom.

13         MR. KIND:  All right.  We'll go off the

14   record and be back in ten minutes.

15         (Recess taken.)

16   BY MR. KIND:

17     Q.  Before we took a break, we were talking about

18   certain dispute codes, and you had mentioned that,

19   depending on the code, sometimes the system will

20   update or delete a record just based on a code without

21   documentation.  Do you remember we were discussing

22   that?

23     A.  Yes.

24     Q.  As far as the codes that were used for

25   Mr. Tuttobene's disputes, were those the sorts of

Page 55

1  codes that the system would update or delete

2  information without additional documentation?

3          MR. SAULS:  Objection, calls for speculation.

4          THE WITNESS:  Um, in his case, no, those

5  would not be codes that would be used.

6  BY MR. KIND:

7      Q.  Could you clarify what you mean, they would

8  not be used?

9      A.  So in -- his claim was payment history, he

10  was disputing a late payment history.  So the code

11  that was used to dispute the late payment history

12  would not be a code that would delete or change an

13  account.

14      Q.  Without documentation?

15      A.  Without documentation, correct.

16      Q.  Okay.  So for Mr. Tuttobene's type of

17  dispute, he could have put almost anything in his

18  dispute letter, but without documentation, TransUnion

19  wouldn't update or delete the disputed information; is

20  that right?

21          MR. SAULS:  Objection, calls for speculation,

22  compound.

23          THE WITNESS:  I can't say that's correct.

24  BY MR. KIND:

25      Q.  Okay.  Why not?

Page 56

CONFIDENTIAL

1          A.    Because there are so many different

2    scenarios, I can't say that if he sent in some other

3    type of dispute that there wouldn't be an update to

4    the account.

5          Q.    Let me ask you this.    When a consumer is

6    disputing a late notation, are there any codes that

7    TransUnion could use that would update or delete that

8    late notation without supporting documentation from

9    the consumer?

10         A.    No.

11         Q.    Okay.    So in that scenario, the next step for

12   TransUnion would be the ACDV process, correct?

13         A.    Correct.

14         Q.    What is the ACDV process?

15         A.    The process would be to send the dispute

16   codes and all the relevant information for the data

17   furnisher to review, and it's electronic.

18         Q.    Okay.   And we discussed before that the

19   response comes back, and then, at least in this case,

20   the process is electronic, and then the

21   reinvestigation results get sent out to the consumer,

22   correct?

23              MR. SAULS:   Objection to the extent it

24   misstates prior testimony.

25              THE WITNESS:   Well, the account would be

1    updated based on whatever changes were on the ACDV,

2    and then the results would be generated and sent to

3    the consumer.

4    BY MR. KIND:

5        Q.   And when you say "the account would be

6    updated," that's an automatic computer process as

7    opposed to a manual representative process, right?

8        A.   Correct.

9            MR. SAULS:   Mr. Kind, pardon my interruption.

10    You are referring to, without having submitted an

11    exhibit, TransUnion's confidential documents, policies

12    and procedures, and that's fine if you don't want to

13    submit an exhibit, but I would just like to note for

14    the record that TransUnion's policies and procedures

15    were produced under a protective order with a

16    confidential marking, and so any testimony concerning

17    those documents or the policies and procedures therein

18    will also be designated as confidential per our

19    protective order.

20            MR. KIND:   That's fine.  And similar for any

21    information that's being discussed about

22    Mr. Tuttobene's personal identifying information

23    should also definitely be redacted or filed under seal

24    and is designated as confidential without the proper

25    redactions.

Page 58

1  they handle his dispute; what did they believe

2  happened there?

3          MR. SAULS:  Objection, compound, ambiguous,

4  and calls for narration.

5          THE WITNESS:  I cannot say what the

6  representative that processed the dispute believed.

7  We have specific procedures and policies that we have

8  to abide by.

9  BY MR. KIND:

10     Q.  Okay.  When TransUnion sent its ACDVs to NAF,

11  what was it trying to verify from NAF?

12     A.  From my recollection, we asked them to verify

13  the payment history on the account and balances.

14     Q.  So when you say verifying payment history, do

15  you agree with me now, though, that Mr. Tuttobene

16  wasn't disputing the payment history?  In other words,

17  he wasn't saying that his payment wasn't -- he wasn't

18  saying that he wasn't late in 20 -- in February -- let

19  me start that again.

20          Now, after sitting here today, do you agree

21  with me that Mr. Tuttobene did not dispute that NAF

22  considered his payment for January 2018 as 30 days

23  late; do you agree with that?

24          MR. SAULS:  Objection, compound, and

25  ambiguous.

Page 89

1          THE WITNESS:  Can you repeat that again?

2  BY MR. KIND:

3     Q.  Sure.  Mr. Tuttobene is not disputing that

4  NAF claims that he was 30 days late in January 2018;

5  do you agree with that?

6          MR. SAULS:  Objection, compound, ambiguous,

7  and leading.

8          THE WITNESS:  From my recollection without

9  looking at the document, I believe he was disputing

10  that he was not late in February 2018.

11  BY MR. KIND:

12     Q.  Uh-huh.  Okay.  So for that month,

13  Mr. Tuttobene's dispute was not that -- he wasn't

14  saying that NAF had accepted his payment; he was

15  saying that NAF didn't accept his payment, but it

16  should not be reported because he tried to make the

17  payment.  Do you agree with that?

18          MR. SAULS:  Objection, compound, and

19  ambiguous.  And I'm going to have my client answer.

20  Would it be helpful to pull up the actual dispute?

21          THE WITNESS:  That was going to be my next

22  question.  Could you pull it up so I can look at it?

23  BY MR. KIND:

24     Q.  We will get to -- we will get to that.  But I

25  just want to really understand TransUnion's position

Page 90

1   in this case.  So -- and what they were thinking at

2   the time.

3           So in other words, what do you understand to

4   be Mr. Tuttobene's dispute?

5           MR. SAULS:  Objection, narration, and calls

6   for speculation, compound.  And will ask respectfully

7   again, we believe we certainly have the dispute in

8   evidence, we can definitely take a look at that.

9   Might make for an easier deposition, Mr. Kind, but

10  whatever you prefer.  And, you know, my client is

11  trying to tell you that she kind of wants to look at

12  the dispute.  So is that okay?  Can we look at that?

13  BY MR. KIND:

14      Q.  Is that your response, that you don't know

15  and you want to look at the dispute?

16      A.  Yes, I would like to look at the dispute,

17  please.

18      Q.  Okay, so let's do that.

19          Are you able to see my screen?

20      A.  Yes.  If you can enlarge it just a little

21  bit.

22      Q.  I will.  Okay, let's get it a little bigger.

23  All right, so we're on TU 40, so Bates No. TU 40.

24  This is the dispute letter from June 10, 2019.

25          And I'll wait for you, Mr. Sauls, until

Page 91

1  you're ready to continue.

2          MR. SAULS:  Yes, please.  I'm ready.

3  BY MR. KIND:

4      Q.  So does this help you respond to my question?

5      A.  Yes.  But can you repeat the question again?

6      Q.  Sure.  The question was, does TransUnion

7  think -- is it TransUnion's position -- well, the

8  question is this:

9          Mr. Tuttobene's dispute was not that NAF

10  accepted his payment and it was posted.  Rather, his

11  dispute is that NAF was refusing his payment and he

12  had tried to make his payment.  Do you agree with

13  that?

14          MR. SAULS:  Objection, compound and vague.

15          THE WITNESS:  I would say that he's saying

16  that NAF is incorrectly reporting that his payment was

17  late or past due.

18  BY MR. KIND:

19      Q.  But why is he saying that it's incorrect?  Is

20  he saying that this is incorrect because they actually

21  did take my payment and I wasn't 30 days late, or

22  rather, he's saying that they refused his payment

23  because of the old account number, and that I tried to

24  make my payment, but they refused it, and therefore

25  I'm not 30 days late?

Page 92

1          MR. SAULS:  Objection, ambiguous, calls for
2     speculation, and compound.
3          THE WITNESS:  Yeah, in his letter, he does
4     say that they were -- he did say that they were
5     refusing his payment because he was using the old
6     account number.
7     BY MR. KIND:
8        Q.  Okay.  So as a result of this dispute letter,
9     TransUnion then did not update his account, correct?
10         MR. SAULS:  Objection, vague.
11         THE WITNESS:  TransUnion sent the dispute
12    letter, along with his disputes, to NAF.
13    BY MR. KIND:
14       Q.  To NAF.  And in the ACDV, TransUnion was
15    asking NAF to verify his -- to verify the late
16    notation, correct?
17       A.  Yes.  Asked them to verify all the payment
18    status and the payment history on the account.
19       Q.  Okay.  But again, Mr. Tuttobene wasn't
20    disputing that the payment was entered 30 days past
21    due.  So my question to you is, what was the purpose
22    of asking NAF to verify it --
23         MR. SAULS:  Objection --
24    BY MR. KIND:
25       Q.  -- that it was entered 30 days past due?

                                            Page 93

1          MR. SAULS:  I apologize.

2          Objection, assumes facts not in evidence,

3    calls for speculation and vague.

4          THE WITNESS:  I would say, me personally

5    looking at this document, if you go to the first page,

6    he said that it was inaccurate that I am past due an

7    amount, $802.  This is inaccurate because I'm not past

8    due on my obligations.  So to me -- and then he says,

9    "Specifically, NAF reports that I was 30 days past due

10   in February 2018.  I was not."

11         So me personally, I would have disputed it,

12   the February 2018 payment, because he's saying that he

13   was not 30 days past due for that month.

14   BY MR. KIND:

15       Q.  Right.  But would you have continued to read

16   the rest, or at this point is it pretty clear -- "at

17   this point," I mean where it says "...February 2018.

18   I was not."  At this point, is it pretty clear what

19   the dispute is, or would you or the representative

20   have continued to read his justification?

21       A.  We would continue to read -- I'm sorry.

22         MR. SAULS:  Objection, calls for speculation,

23   ambiguous.

24         THE WITNESS:  Okay.  So we would continue to

25   read the entire investigation.  And like I say, we

Page 94

```
 1    personally read the entire document.  It justifies
 2    using the code that we used.
 3    BY MR. KIND:
 4        Q.  Okay.  Yeah, and that's what my question is.
 5    When he's not disputing that the payment was entered
 6    30 days late, he's just trying to provide a
 7    justification, so then what's the point of asking NAF
 8    to verify that the payment was or was not made 30 days
 9    late?
10            MR. SAULS:  Objection, assumes facts not in
11    evidence, and ambiguous, calls for speculation.
12            THE WITNESS:  Well, we sent NAF the letter
13    that Mr. Tuttobene sent us.  And in his letter, he is
14    saying that we're reporting him past due 30 days and
15    he was not.  So we want to address that, because in
16    looking at his letter, it looks like he wants that
17    information corrected or removed.
18    BY MR. KIND:
19        Q.  Uh-huh.  So if you were handling this dispute
20    now, would you put in the comment to NAF this
21    justification down here, or would you have done it
22    exactly the same way as they have?
23            MR. SAULS:  Objection, calls for speculation.
24            THE WITNESS:  Me personally, I would have
25    done it maybe not exactly, because I remember they
```

Page 95

1    gave like extra information, but the information asked

2    them to verify the payment history.  I would have done

3    that.  And I would have also sent a copy of the letter

4    to NAF so they can see exactly the details of the

5    dispute.

6    BY MR. KIND:

7         Q.  You said "not exactly."  Would you have left

8    a note in the ACDV comments section something along

9    the line of consumer claims he tried to make payment,

10   something like that?  Is that something that you would

11   do?

12             MR. SAULS:  Objection, calls for speculation.

13             THE WITNESS:  I'm not sure.  I don't think

14   so.  I think the code used captured his dispute.

15   BY MR. KIND:

16        Q.  What's the reason why you wouldn't put that

17   in there; is it because it's irrelevant?

18             MR. SAULS:  Objection, calls for speculation.

19             THE WITNESS:  Well, as I stated before, I

20   feel like the code captures his dispute.  And we also

21   sent a copy of the details to the data furnisher, so

22   they are able to see the details.

23   BY MR. KIND:

24        Q.  You said the call captures the dispute?

25        A.  The code.  Sorry, the dispute code that was

Page 96

1  used captures the dispute.

2      Q.  We'll get to the dispute in just a little

3  bit.  But you can verify now, if you know, that code

4  does not have what we're calling his justification

5  here, correct?

6          MR. SAULS:  Objection, leading.

7          THE WITNESS:  I would say it does.  Like I

8  said, he's asking us to correct his payment history,

9  the late payment.

10  BY MR. KIND:

11      Q.  Okay.  Well, the code asks them to verify

12  whether or not he was 30 days past due.  But the code

13  does not say or does not incorporate, he tried to make

14  his payment, he's saying it's not his fault.  You

15  remember that, right?

16          MR. SAULS:  Objection, assumes facts not in

17  evidence, and vague.

18          THE WITNESS:  The code does ask them to

19  verify the information.  The letter also gives them

20  the details of what his dispute is.

21  BY MR. KIND:

22      Q.  Understood.  Okay.  Moving back just a little

23  bit.  Right now we're talking about the ACDV, but I

24  want to go right before the ACDV process.  So

25  TransUnion's internal investigation before it sends

Page 97

1    its ACDV.

2            So did TransUnion code or note or comment or

3    in any way document that Mr. Tuttobene's dispute

4    related to him saying that he had tried to make his

5    payment, but it was rejected?

6            MR. SAULS:  Objection, vague.

7            THE WITNESS:  Are you asking about a comment

8    in the system?

9    BY MR. KIND:

10       Q.  Correct.

11       A.  No.

12       Q.  Okay.  In its own investigation, TransUnion

13   considered this as somebody who is disputing that NAF

14   is saying he's 30 days late, correct?

15           MR. SAULS:  Objection, ambiguous, and calls

16   for speculation.

17           THE WITNESS:  Can you repeat the question?

18   BY MR. KIND:

19       Q.  Sure.  The way TransUnion handled this

20   dispute -- because I asked you about if they put in

21   any codes of something relating to his justification

22   here.

23           So now I'm saying -- or I'm asking you -- the

24   way that they handled this dispute was as someone who

25   is disputing that NAF has reported that his payment

Page 98

1    wasn't made within 30 days, correct?
2         MR. SAULS:  Objection, compound, ambiguous,
3    and calls for speculation.
4         THE WITNESS:  Well, we sent all the relevant
5    information to the data furnisher.
6    BY MR. KIND:
7         Q.  So, I'm sorry, you can finish your answer.
8         A.  That's it.  We sent all the relevant
9    information to NAF: we sent the dispute code, sent a
10   copy of the letter, everything that was relevant to
11   his dispute.
12        Q.  I understand that, and I'm not asking about
13   the ACDV process.  I'm asking before that as part of
14   TransUnion's own investigation, right?  So do you have
15   a different answer for that?
16             MR. SAULS:  Objection, vague.
17             THE WITNESS:  Can you repeat it again?  Maybe
18   I'm not understanding what you're asking.
19   BY MR. KIND:
20        Q.  Yeah.  So in TransUnion's own internal
21   investigation, did they consider the fact -- these
22   justifications that Mr. Tuttobene was giving them, or
23   did they just handle this as a general dispute where
24   someone says that it's being reported 30 days late,
25   let's verify it with the data furnisher?

Page 99

CONFIDENTIAL

1              MR. SAULS:   Objection, compound, ambiguous.

2              THE WITNESS:   So when we get documentation,

3      we do review and consider everything that's in the

4      documentation, and we handle it accordingly, according

5      to our policies and procedures.

6      BY MR. KIND:

7          Q.   So did TransUnion consider his justification,

8      the reason why his payment was 30 days late?

9              MR. SAULS:   Same objection.

10             THE WITNESS:   TransUnion doesn't make that

11     decision.   We reviewed it, considered what he said,

12     and we sent all the relevant information to NAF.

13     BY MR. KIND:

14         Q.   When you say TransUnion doesn't make that

15     determination or that decision, why is that?

16             MR. SAULS:   Objection, misstates prior

17     testimony.

18             THE WITNESS:   Can you ask that question

19     again?

20     BY MR. KIND:

21         Q.   Yeah.   You said TransUnion doesn't consider

22     that information; we sent it to NAF.   Generally,

23     that's what you said.   So why doesn't TransUnion

24     consider this part of his letter where he puts the

25     justification in?

Page 100

1            MR. SAULS:  Objection, misstates testimony,

2    and vague.

3            THE WITNESS:  I'm not saying that TransUnion

4    doesn't consider his letter.  That's not what I was

5    trying to communicate.

6            What I'm saying is that we review the

7    information and we consider everything that's included

8    in the documentation envelope that comes along with

9    it.  And we take the information, and in accordance

10   with our policies and procedures, we'll handle it

11   accordingly.

12   BY MR. KIND:

13       Q.  So did TransUnion in this case consider the

14   fact that Mr. Tuttobene is saying that the reason why

15   his payment was 30 days late is because he tried to

16   make the payment, but it was rejected.  Did they

17   consider that part of the investigation or not?

18           MR. SAULS:  Objection, asked and answered.

19           THE WITNESS:  I would have to say yes.

20   BY MR. KIND:

21       Q.  Okay.  So when they considered it, what was

22   their determination or their decision based on that

23   consideration?

24           MR. SAULS:  Objection, vague, calls for

25   speculation.

                                          Page 101

CONFIDENTIAL

1          THE WITNESS:  Our decision was to send all

2     the relevant information to NAF.

3     BY MR. KIND:

4          Q.  So again, I'm not asking about the ACDV

5     process.  I'm talking specifically about TransUnion's

6     investigation, right?  So what was Trans -- so

7     TransUnion considered the fact that he was saying I

8     tried to make my payment, but they rejected it.  So

9     they considered that.  What was their determination of

10    that justification?

11         MR. SAULS:  Objection, assumes facts not in

12    evidence, compound, and ambiguous.

13         THE WITNESS:  I don't think I can answer

14    that.  Only thing I can say is that when we get the

15    information, we review it, we consider it, and then we

16    follow the policy and procedure accordingly.

17    BY MR. KIND:

18         Q.  Okay.  And in this particular case, they

19    considered the fact that he was -- I'm sorry.

20             So for this dispute letter that we have open

21    here on TU 41, TransUnion considered Mr. Tuttobene's

22    justification for being 30 days past due and they

23    decided that -- well, question is what was their

24    determination?  Do you understand the question?

25         A.  Well, I can't speak for the person who

                                             Page 102

CONFIDENTIAL

1   processed the information, what their determination

2   was.  I only can go by what I see.  And from what I

3   see, the decision to send the dispute along with the

4   relevant information was accurate.

5        Q.  Okay.  So you're talking again about the

6   ACDV, so let's clarify something.

7            Do you believe that TransUnion has a duty to

8   investigate Mr. Tuttobene's dispute internally, not

9   including the ACDV process?  So does TransUnion have

10  that duty to investigate this dispute letter

11  internally?

12           MR. SAULS:  Objection, asked and answered,

13  and calls for speculation.

14           THE WITNESS:  Yes, we do -- we do internally

15  review the documents and letters that the consumers

16  send in.

17  BY MR. KIND:

18       Q.  And you do also make a determination at the

19  conclusion before you send out an ACDV, correct?

20           MR. SAULS:  Objection, asked and answered.

21           THE WITNESS:  Yeah, so the determination is

22  based on our policies and our procedures.

23  BY MR. KIND:

24       Q.  Understood.  But that wasn't my question.

25           My question is, TransUnion makes a decision

Page 103

1  before it sends out its ACDV, correct?

2          MR. SAULS:  Same objection.

3          THE WITNESS:  That's correct.

4  BY MR. KIND:

5      Q.  So in this case, TransUnion reviewed this

6  letter, and you said it considered the fact that he

7  was giving this justification for being 30 days late.

8  And therefore, after that, TransUnion decided to still

9  report him 30 days past due, correct?

10         MR. SAULS:  Same objection.

11         THE WITNESS:  Well, TransUnion did not report

12  him 30 days past due, NAF did.  So we reviewed the

13  information; we didn't -- there was no documentation

14  to support or for us to internally update the account

15  or change it.  So at that point, we had to send the

16  ACDV along with the letter to NAF.

17  BY MR. KIND:

18     Q.  And again, I'm not talking about the ACDV

19  process.  I'm talking about TransUnion's internal

20  investigation.  And what -- so let me clarify what you

21  said.

22         You said that we did not report this, NAF

23  reported this.  Correct?

24         MR. SAULS:  Objection to the extent it

25  misstates former testimony.

Page 104

CONFIDENTIAL

1    BY MR. KIND:

2        Q.  Is that correct?

3        A.  Yes.  NAF reported the 30-day past due.

4        Q.  So, so long as NAF confirms that it still

5    wants to report this account late, TransUnion's

6    position on this is, therefore, we will not update

7    this and continue to leave this 30-day notation on the

8    file, correct?

9            MR. SAULS:  Same objection.

10           THE WITNESS:  I believe TransUnion's position

11   is to contact the lender or data furnisher, like an

12   in-between person between them, so they can figure it

13   out and get it corrected, if it's inaccurate.

14   BY MR. KIND:

15       Q.  So this whole line of questioning started

16   because I'm trying to ask you why TransUnion is

17   sending -- why TransUnion sent the ACDV to NAF, what

18   TransUnion thought the ACDV response will show.  For

19   example, if a consumer says that this payment was

20   accepted by NAF -- right -- then it would make sense

21   logically to send something to NAF to verify that the

22   consumer is telling the truth.  Does that make sense

23   to you?

24           MR. SAULS:  Objection, it's vague and calls

25   for speculation, compound.

                                        Page 105

1              THE WITNESS:  Can you repeat that?

2    BY MR. KIND:

3        Q.  Sure.  The purpose -- what I'm trying to ask

4    you, and I've been trying to ask you this for the last

5    ten minutes, is why did TransUnion send an ACDV in

6    this case?  Because the plaintiff is not disputing the

7    fact that he was 30 days late; he's only saying that

8    he has a justification that TransUnion should

9    consider.  So given that, what was TransUnion trying

10   to accomplish?  What information were they trying to

11   verify from NAF?

12             MR. SAULS:  Objection, asked and answered,

13   ambiguous, compound, and argumentative.

14             THE WITNESS:  Well, I thought I answered

15   that.  So in the letter, the consumer is indicating

16   that something on his report is inaccurate, his

17   payment, his past due amount of payment was

18   inaccurate.  So we sent the ACDV for NAF to review his

19   claim, his dispute, so they can provide and update the

20   credit report accurately.

21   BY MR. KIND:

22       Q.  Okay.  You're using the word "accurate" and

23   "inaccurate" and to verify the account.  He's actually

24   not saying that I dispute the accuracy and please

25   verify.  He's being very specific in this dispute.  I

                                        Page 106

CONFIDENTIAL

1   don't think you're answering the question, but I do

2   think you understand it, but I'll move on because it

3   sounds like we're not going to get anywhere on this,

4   and maybe we can circle back later.

5         So while we're on this topic here, regardless

6   of why TransUnion sent that ACDV, we did mention that

7   TransUnion considered the fact that he was giving a

8   justification.  Do you agree with me that TransUnion

9   still -- that TransUnion could have, if it chose --

10   without an ACDV, TransUnion could have removed that

11   30-day notation; do you agree with that?

12         MR. SAULS:  Objection, misstates matters in

13   evidence, and ambiguous, asked and answered.

14         THE WITNESS:  Can you repeat that?

15   BY MR. KIND:

16     Q.  Sure.  Before sending an ACDV to NAF,

17   TransUnion could have removed this 30-day notation,

18   correct?

19         MR. SAULS:  Objection, calls for speculation.

20         THE WITNESS:  Well, based on the documents

21   that were sent and reviewed, there is nothing that

22   would allow us to remove a 30-day late.  There's

23   nothing in our policies and procedures in this case to

24   remove the late payment.  There is no documentation.

25   I really don't want to say we sent the ACDV, but that

Page 107

1    was basically the outcome.

2    BY MR. KIND:

3         Q.   That wasn't my question again.

4              My question is, TransUnion could have, if it

5    had a policy to or whatever, it could have said, oh,

6    we like this justification, that's correct, we're

7    going to remove this regardless of what NAF tells us?

8    It could have done that, correct?

9              MR. SAULS:   Objection, compound, assumes

10   facts not in evidence, calls for speculation, and

11   ambiguous.

12             THE WITNESS:   We're required to follow our

13   policies and procedures.

14   BY MR. KIND:

15        Q.   Is there ever a scenario when TransUnion will

16   delete a 30-day late notation, ever, without sending

17   an ACDV or before sending an ACDV?

18             MR. SAULS:   Objection, compound, calls for

19   speculation.

20             THE WITNESS:   Yes.

21   BY MR. KIND:

22        Q.   Okay.   And it does that when the dispute

23   letter together with any attached documents supports

24   removing the 30-day notation, correct?

25             MR. SAULS:   Same objection.

                                       Page 108

1          THE WITNESS:  Right.  If they have attached

2   documents that support removing it, yes, we are able

3   to remove the lates at this time.

4   BY MR. KIND:

5       Q.  Based on this letter, without attachments to

6   this particular letter, TransUnion correctly, in your

7   opinion, did not remove the 30-day notation, correct?

8       A.  Correct.

9       Q.  Okay.  And -- okay.

10          So other than reading the letter, considering

11  this justification, and sending the ACDV, did

12  TransUnion do anything else as far as its

13  reinvestigation?

14          MR. SAULS:  Objection, compound and vague.

15          THE WITNESS:  Well, we sent the investigation

16  results along with -- they include, like, instructions

17  if the consumer disagreed with them.

18  BY MR. KIND:

19      Q.  Okay.  Anything else besides sending that to

20  NAF?

21          MR. SAULS:  Same objection.

22          THE WITNESS:  Not that I'm aware of.

23  BY MR. KIND:

24      Q.  Okay.  Are you -- did TransUnion -- when they

25  considered this justification by Mr. Tuttobene for

                                        Page 109

CONFIDENTIAL

1   being 30 days late, did TransUnion have any reason not

2   to believe him?

3          MR. SAULS:  Objection, assumes matters not in

4   evidence, ambiguous.

5          THE WITNESS:  I don't think it's our position

6   to believe or not believe.  We have strict policies

7   and procedures that we have to follow.

8   BY MR. KIND:

9      Q.  And in this case, that procedure was to send

10  an ACDV, correct?

11     A.  That's correct.

12     Q.  As you sit here today, though, after we have

13  reviewed everything and we're a year or so later, do

14  you have any reason to believe that plaintiff was not

15  telling the truth in this letter?

16         MR. SAULS:  Objection, calls for speculation.

17         THE WITNESS:  I can't give my opinion.  He

18  could be telling the truth.  I wouldn't say he's not

19  telling the truth, but our policy -- we have policies

20  to follow.

21  BY MR. KIND:

22     Q.  And the policy in this case is to send the

23  ACDV to the furnisher, correct?

24         MR. SAULS:  Objection, asked and answered.

25  BY MR. KIND:

CONFIDENTIAL

1          Q.   That's correct?

2          A.   That is correct.

3          Q.   And if NAF updated it to remove the 30 days,

4     then TransUnion would have removed it, correct?

5          A.   That is correct.

6               MR. SAULS:   Same objection.

7     BY MR. KIND:

8          Q.   And if NAF did not update the 30-day

9     notation, then TransUnion would not update the 30-day

10    notation, correct?

11              MR. SAULS:   Objection, calls for speculation.

12    BY MR. KIND:

13         Q.   Is that correct?

14         A.   Yes.

15         Q.   In this case, NAF did not update the 30-day

16    notation and TransUnion did not update the 30-day

17    notation, correct?

18              MR. SAULS:   Objection, misstates prior

19    testimony, and vague.

20              THE WITNESS:   Yes, NAF did not send us an

21    update to the 30-day late.

22    BY MR. KIND:

23         Q.   And therefore, TransUnion did not remove the

24    30 days late, correct?

25              MR. SAULS:   Objection, vague.

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL

```
 1              THE WITNESS:  The 30-day late was not
 2    removed, correct.
 3    BY MR. KIND:
 4       Q.    Because NAF did not remove it, correct?
 5              MR. SAULS:   Objection, vague, asked and
 6    answered.
 7              THE WITNESS:   Correct.   NAF did not send the
 8    request to remove the 30-day late.
 9    BY MR. KIND:
10       Q.  So is there any way that -- and we'll move on
11    after this.  But is there any way that Mr. Tuttobene
12    could have given TransUnion -- let me start that
13    again.
14              MR. SAULS:  Ms. Johnson, I want to make sure,
15    can you hear me okay?
16              THE REPORTER:  Yes.
17              MR. SAULS:  Okay.  I'm getting a little bit
18    of feedback like a typing.  But I can hear everyone
19    else.
20              Mike, I want you to finish your questioning,
21    and we'll just ask that at some point, I think we're
22    about three hours in, including the breaks, if we
23    could maybe break for lunch after you get to a
24    stopping point.
25              MR. KIND:  Sure.  I have about ten minutes
```

Page 112

1   this was deleted; this all stayed, correct?

2       A.  Correct.

3           MR. SAULS:  Can you speak up a bit, Mr. Kind?

4   You're getting a little quieter on that end.

5           MR. KIND:  Will do.

6       Q.  On TU 84, again this is information that

7   remained on the credit report after the ACDV came

8   back, correct?

9       A.  Yes.

10      Q.  We're on TU 85.  Could you tell me what this

11  is?

12          MR. SAULS:  Asks for narrative.

13          THE WITNESS:  Yes, that's the cover page for

14  the investigation results.

15  BY MR. KIND:

16      Q.  And can you see who sent out -- or who

17  handled this reinvestigation results to be sent to

18  Mr. Tuttobene?

19      A.  So it would be the part where it says

20  Information for Internal Use, and it says "ACDV,"

21  "CRS," "TU Corporate."

22      Q.  So this would be automated as opposed to

23  somebody -- like before we saw it had somebody's name.

24  Correct?

25      A.  Yes.

Page 199

1       Q.   Okay.   And then from TU 86, these would be

2   the results that were mailed to Mr. Tuttobene,

3   correct?

4       A.   Yes.

5       Q.   All right.   And then on 87, it shows the key

6   as showing that the tag "30" means 30 days late,

7   correct?

8       A.   Yes.

9       Q.   And then on 89, it shows that that 30-day

10  notation is still appearing on February 2018, right?

11      A.   Yes.

12      Q.   On TU 86, when -- if TransUnion does No. 3,

13  determined that the data furnisher had previously

14  verified the reported information, if that's what

15  happened, would TransUnion still send an ACDV or no?

16          MR. SAULS:   Objection, calls for speculation.

17          THE WITNESS:   No, if it was previously

18  verified, TransUnion would not send the ACDV.

19  BY MR. KIND:

20      Q.   We talked before about that hundred-word

21  statement.   Where on this report would that

22  hundred-word statement appear, if anywhere?

23          MR. SAULS:   Objection, ambiguous.

24          THE WITNESS:   If the consumer asks us to add

25  a 100-word statement, I believe it would be on the

Page 200

CONFIDENTIAL

1   investigations results page.

2   BY MR. KIND:

3        Q.   So is that here, TU 89?

4        A.   Yeah.  I'm not sure, but it would -- it would

5   be somewhere in the investigation results document.

6        Q.   Do you see anywhere that there is one of

7   those hundred-word statements appearing on this

8   reinvestigation results document?

9        A.   No.  The consumer didn't ask for one.

10       Q.   How do you know that -- does TransUnion have

11  a specific method for consumers to ask for a

12  hundred-word statement, or could they just include it

13  in their dispute letter?

14       A.   They can just include it in their dispute

15  letter.  They would have to specifically say that they

16  would like this statement added to their consumer

17  report.

18       Q.   Okay.  So if the consumer -- if the dispute

19  letter asks for it, then this would not be

20  TransUnion's policy -- this -- so let me say that

21  again.

22            If he had asked for a hundred-word statement

23  in his letter, then this reinvestigation results would

24  not follow TransUnion's policy because it does not

25  include the hundred-word statement; do you agree with

Page 201

```
 1    that?
 2              MR. SAULS:  Objection, assumes facts not in
 3    evidence, and calls for speculation.
 4              THE WITNESS:  Can you repeat that question?
 5    I'm sorry.
 6              MR. SAULS:  Can you blow up your -- I'm
 7    sorry, Mr. Kind, I'm not seeing your screen again.
 8              Okay, thank you.
 9    BY MR. KIND:
10        Q.  So the question is --
11              MR. SAULS:  I cut out on the last part.  Are
12    you talking about the dispute or after they receive
13    their results?  I didn't hear what you said.
14              MR. KIND:  I'll ask the question again.
15              MR. SAULS:  Okay.
16    BY MR. KIND:
17        Q.  If Mr. Tuttobene had asked for a hundred-word
18    statement in his dispute letter that we looked at
19    before, then this reinvestigation result document
20    would not comply with TransUnion's procedures because
21    it does not include a hundred-word statement.  Is that
22    correct?
23              MR. SAULS:  Objection, ambiguous and vague,
24    calls for speculation.
25              THE WITNESS:  I don't understand what you
```

Page 202

1    mean "would not comply."  If his dispute letter

2    included the 100-word statement, we would add it to

3    his consumer -- his consumer disclosure.

4    BY MR. KIND:

5        Q.  Okay.  But so my question is -- and it would

6    appear somewhere here in this reinvestigation results

7    document, correct?

8            MR. SAULS:  Objection, ambiguous, and calls

9    for speculation.

10           THE WITNESS:  And again, I'm not sure of

11   exactly where it would appear, but it would appear

12   wherever we -- you know, whatever we mailed to him, we

13   would let him know that a consumer statement was added

14   to his consumer disclosure.

15   BY MR. KIND:

16       Q.  And this document we have here in front of

17   us, it does not have a hundred-word statement.  Do you

18   agree?

19       A.  I agree.

20       Q.  So if Mr. Tuttobene had included a request

21   for a hundred-word statement, if that was the case,

22   then this document would not comply with TranUnion's

23   procedures, correct?

24           MR. SAULS:  Objection, ambiguous, and

25   leading, and beyond the scope of the notice of the

Page 203

1    deposition.

2           THE WITNESS:  And again, I'm not sure if the

3    consumer statement would be in this part of the

4    investigation results that would be mailed to

5    Mr. Tuttobene.  It would be in one of the pages of

6    those results.  Like I said, I don't really know the

7    format, right just looking at this, where it would be.

8    Because there is none, so I don't know -- I don't know

9    where to say that statement would be.

10   BY MR. KIND:

11        Q.  I'm not asking you to tell me where it is.  I

12   think you already answered that it doesn't appear.  We

13   looked through this document and it's not here.  I'm

14   not asking you where it would be.

15          My question is that, if Mr. Tuttobene had

16   included a request in his dispute for the hundred-word

17   statement, then this document does not follow

18   TransUnion's procedures, because this document doesn't

19   have a hundred-word statement.  True or false?

20          MR. SAULS:  Objection, vague and ambiguous,

21   calls for speculation.

22          THE WITNESS:  I'll answer you this way, if --

23   I guess we're speaking hypothetically -- he requested

24   a 100-word statement, the investigation results -- and

25   we're talking about what he submitted and specifically

Page 204

1    what he said, and he added a 100-word statement, then

2    the investigation results would include what we see

3    here on this page and it would include the -- a notice

4    letting him know that we added a 100-word statement.

5            MR. SAULS:  Mr. Kind, can we take a break

6    right before the hour here?  I think it's 8 o'clock

7    Ms. Kimp's time.

8            MR. KIND:  Do you want to do that now or go a

9    couple more minutes?

10           MR. SAULS:  It's up to you.  I'd rather just

11   kind of run and do it now, if that's okay.

12           MR. KIND:  Let's do it.

13           MR. SAULS:  Right back at 8 o'clock,

14   Ms. Kimp's time, okay?

15           MR. KIND:  Yes.

16           (Recess taken.)

17           MR. SAULS:  Just to put on the record,

18   Mr. Kind and I just had an off-the-record

19   conversation, and just to capture that for the record,

20   the time is now 7:00 p.m. Central time.  The

21   deposition started a 12:00 p.m. Central time, so it's

22   been seven hours, not including a handful of breaks

23   and an hour lunch.  Mr. Kind has indicated he's going

24   to push through the entire hour and a half and exhaust

25   the seven-hour deposition time and then allow counsel

Page 205

1  for TransUnion to handle cross-examination at the

2  remainder of the time.

3          I will state for the record, Mr. Kind, if you

4  do that, you will not have the availability for a

5  redirect.  Your time is seven hours per the Federal

6  Rules of Civil Procedure, so should you exhaust that

7  entire one hour and a half and exhaust our seven

8  hours, after I do my cross-examination, your

9  redirect -- we are not going to participate in

10 redirect because you do not have time remaining in the

11 seven-hour time period you're given under the rules.

12 So you can agree or disagree with that.  I'll state

13 that for the record.

14         I will also state for the record, my client

15 is on the East Coast, it is now 8:00 p.m., we are

16 heading to the nighttime.  Mr. Kind is entitled to

17 move through the disputes.  He's on dispute 1; he's

18 entitled to move through the documents at his pace.

19 But there is a seven-hour allotment under the Federal

20 Rules of Civil Procedure, and that is not enhanced

21 because of a perceived need for redirect.  So we can

22 move through an entire hour and a half and completely

23 exhaust the seven hours, but that will be it.

24         MR. KIND:  Well, what we can do is I can stop

25 a little bit before an hour and a half and just

Page 206

1    reserve a little time for rebuttal as well.  For the

2    record, the transcript will speak for itself.

3         The responses -- we spoke about this off the

4    record -- the responses we are getting are largely

5    nonresponsive, I've had to repeat myself; many, many,

6    speaking objections, which were discussed, are taking

7    a lot of time, including the speech we just got.

8         So I'm doing my best to move through these.

9    I have everything highlighted, pretty fast questions,

10   but I'm getting stuck a lot on the responses and the

11   objections are taking time.  So I'm doing my best to

12   move this forward.  I want to be done as soon as

13   possible, but I do need to get through the questions

14   that I need to ask for my client's case.

15        MR. SAULS:  Understand.  And the last thing I

16   will say is, Mr. Kind, you have not made one single

17   nonresponsive objection today.  Not one.  So to the

18   extent that you are saying that the responses are

19   nonresponsive, you have yet to make one nonresponsive

20   objection on anything that Mrs. Kimp has said.  So I

21   will respectfully reject your assertion that Mrs. Kimp

22   has been nonresponsive, for you have not objected to

23   it; you have not reserved that right.

24        Nothing further from me, we can continue, but

25   I stand by my previous statement.

Page 207

1          MR. KIND:  Just for the record, it's not my

2    practice to make nonresponsive objections.  I did end

3    up getting my answers, but they're taking a lot of

4    time to get them.

5        Q.  So we're going to continue here on -- we're

6    on Bates No. 86.  And you know what, for the record,

7    this is Exhibit 2.  So I said it before.  So the

8    deposition notice would be Exhibit 1, this whole

9    thing, 1 through 147, is Exhibit 2.  And we're now on

10   Bates No. 86.

11          So before we just took the break, I asked the

12   question that, if Mr. Tuttobene had requested -- and I

13   didn't get a response.  So if -- here's my question:

14          If Mr. Tuttobene had requested in his dispute

15   letter for a 100-word statement, do you agree that

16   this investigation results did not follow TransUnion

17   procedures because this reinvestigation result does

18   not include a 100-word statement?

19          MR. SAULS:  Objection, compound, calls for

20   speculation, assumes facts not in evidence, and

21   incomplete hypothetical.

22          THE WITNESS:  Again, as I stated before, if

23   we are hypothetically speaking, the dispute from

24   Mr. Tuttobene would have to specify that he wanted a

25   100-word consumer comment.  And if he submitted his

                                            Page 208

1  dispute the exact same way as the document we

2  reviewed, then the investigation results would have

3  included the hundred-word statement or an indication

4  that a 100-word statement was added, and it will also

5  include the investigation results page that shows the

6  account and how it appeared after the response from

7  NAF.

8  BY MR. KIND:

9     Q.  Again, the question was not -- you're not

10 responding to my question, so I'm going to ask it a

11 different way.

12        This reinvestigation result does not include

13 a 100-word statement, correct?

14        MR. SAULS:  Objection, asked and answered.

15        THE WITNESS:  Correct.

16 BY MR. KIND:

17    Q.  When a consumer asks for a statement in their

18 dispute letter, then it's TransUnion's policy to

19 include a statement in your reinvestigation results,

20 correct?

21        MR. SAULS:  Objection, calls for speculation,

22 and vague.

23        THE WITNESS:  The consumer would have to

24 specifically ask us to add a 100-word statement to

25 their consumer file.

Page 209

1    BY MR. KIND:

2        Q.  And in that case, it's TransUnion policy to

3    include a statement on the reinvestigation results,

4    correct?

5            MR. SAULS:  Same objection.

6            THE WITNESS:  And again, I'm not sure how

7    it's formatted, but from what I understand, it would

8    indicate that a 100-word statement was added to the

9    consumer file.

10   BY MR. KIND:

11       Q.  Does TransUnion have a specific method that

12   consumers have to ask for that 100-word statement?

13           MR. SAULS:  Objection, vague.

14           THE WITNESS:  If the consumer would like a

15   100-word statement, they can write in to us, contact

16   us by telephone, and request one.

17   BY MR. KIND:

18       Q.  Okay.

19       A.  They can go online also and ask for one.

20       Q.  Does TransUnion require that the consumer use

21   specific phrases or specific words when asking for a

22   100-word statement?

23           MR. SAULS:  Objection, vague.

24           THE WITNESS:  There are no specific words,

25   but it has to be clear that that is what they are

                                              Page 210

CONFIDENTIAL

1    requesting.

2    BY MR. KIND:

3        Q.   Is it okay for a consumer to include that

4    request within a dispute or does it have to be a

5    separate letter?

6        A.   It can be within the dispute, but they have

7    to specify that that's what they want.

8        Q.   Okay.  Do they have to use -- do consumers

9    have to use the word "100" when they're asking for a

10   100-word statement?

11           MR. SAULS:  Objection, vague, beyond the

12   scope of the notice of the deposition.

13           THE WITNESS:  No, they don't have to use the

14   word "100."

15   BY MR. KIND:

16       Q.   Do consumers have to type out their 100-word

17   statement, or can they say something more generally

18   like, "I dispute it.  Please put a statement that I

19   dispute this account"?

20           MR. SAULS:  Objection, vague, and beyond the

21   scope of the notice of the deposition, compound.

22           THE WITNESS:  They would have to indicate

23   that they would like the statement added to their

24   consumer file.

25   BY MR. KIND:

Page 211

1      Q.  Do they have to say this is the statement and

2  tell you what the statement is, or can they say

3  "please add the statement that I dispute," something

4  like that.  Is that acceptable?

5           MR. SAULS:  Objection, vague, and asked and

6  answered.

7           THE WITNESS:  They can say "this is the

8  statement," they can say "please add this statement."

9  BY MR. KIND:

10     Q.  Is it okay if they say "please include a

11  statement that I dispute this account"?

12          MR. SAULS:  Objection.  Mr. Kind, I'm about

13  to ask my client not to answer.  We have answered this

14  question.  If you want to go to the dispute, if you

15  want to look at some more documents.  She's answered

16  this question multiple times and now I'm -- under Rule

17  30, you're harassing my client with respect to this

18  question.  She has answered the question.

19          I'm going to object, asked and answered, and

20  I'm going to respectfully ask you at this hour --

21  she's answered the question multiple times; you're not

22  getting the answer you're looking for, I understand

23  that.  But respectfully, please, I don't want to have

24  to ask my client not to answer the question.  But we

25  need -- we're getting into the harassment category.

                                        Page 212

1    With respect.  She's answered the question.

2            MR. KIND:  All right.  If you would like to

3    instruct your client not to answer, please do, instead

4    of these long speeches taking up time.  So if you

5    think that's what's happening, instruct her.  But my

6    question was different, okay?  The last question I

7    asked is -- and these are different questions, and I'm

8    going to ask it again.

9        Q.  If the consumer says "please include a

10   statement that I dispute this account," is that

11   considered a request that TransUnion would normally

12   honor?

13           MR. SAULS:  Objection, ambiguous, calls for

14   speculation.

15           THE WITNESS:  If the customer says "please

16   add this customer statement to my file," we would add

17   it to the file.

18   BY MR. KIND:

19       Q.  Again, that's not my question.  My question

20   is they say "please add a statement that I dispute

21   this account."

22           MR. SAULS:  Mr. Kind, she just answered this

23   question.

24           MR. KIND:  She didn't.

25           MR. SAULS:  She told you what was needed to

Page 213

1  get the consumer statement for the fourth time,

2  Mr. Kind.  She's stated what is needed to be said.

3  Please, let's move on.

4          MR. KIND:  I will not move on.  You can ask

5  her to not respond, then I'll move on, but I think I'm

6  entitled to an answer.  I'll ask it one more time.

7      Q.  The consumer says "please include a statement

8  that I dispute this account"; is that included in a

9  request that TransUnion would normally honor?

10         MR. SAULS:  Same objection, vague, calls for

11  speculation, argumentative, asked and answered.

12         THE WITNESS:  And again, the consumer would

13  have to specify or make it clear that they want the

14  statement added to their credit file.

15 BY MR. KIND:

16     Q.  Okay, so is that considered clear enough or

17 not?

18         MR. SAULS:  Objection, vague, calls for

19  speculation, asked and answered, argumentative.

20 BY MR. KIND:

21     Q.  You can answer.

22     A.  Okay.  They would have to say "please include

23  this statement on my credit file."

24     Q.  Okay.  Now we got an answer.  So they cannot

25  say "please include a statement I dispute this

Page 214

1    account."  That's your answer.

2         My question to you is, is there a policy that

3    says that somewhere, and do you see that in any of the

4    documents in front of us today?  Throughout this

5    entire Exhibit 2, tell me where to go where I would

6    see that it says that.

7         MR. SAULS:  Objection, compound, vague, asks

8    for a narrative, beyond the scope of the notice of the

9    deposition.

10   BY MR. KIND:

11        Q.  You can answer.

12        A.  Okay.  So in the investigation -- when we

13   send the investigation results, we do notify the

14   consumer that they can add a 100-word statement to

15   their report and it gives an explanation of what that

16   entails.

17        Q.  Uh-huh.  And what I'm -- I know what it says

18   here.  What I'm asking you is, where does it say what

19   you just said?  Which is that if they say "please

20   include a statement that I dispute this account," you

21   said that that is not something that TransUnion would

22   honor.  So where is this over here?

23        MR. SAULS:  Objection, misstates prior

24   testimony, calls for speculation, asked and answered.

25   BY MR. KIND:

Page 215

1      Q.  You can answer.

2      A.  I did not say that's not something that

3  TransUnion would honor.  I said they would have to

4  specify that they want the statement added to their

5  file.

6          MR. SAULS:  Mr. Kind, can you it blow up?  I

7  can't see the document here.  Are you looking at the

8  document that says "Add a 100-word statement to your

9  report"?

10          MR. KIND:  Yes.

11          MR. SAULS:  All right.  Looks like it's

12  cutting the right portion off.  Can you not make the

13  whole graphic bigger?

14          MR. KIND:  Is that better?

15          MR. SAULS:  No, it's about the same.  Let me

16  just get closer.  I'm sorry; what is the Bates number

17  on this one?

18          MR. KIND:  TU 90.

19          MR. SAULS:  I can't keep the Bates numbers

20  straight; you're not mentioning them as you flip to

21  documents.  I think I see what you're looking at where

22  it explains the 100-word statement.

23          MR. KIND:  We haven't flipped on any

24  documents.  We have been on this for some time.

25      Q.  I understand what you're saying, but I have

                                            Page 216

1    to clarify it.  My question is basically to tell me if

2    a specific statement qualifies or does not qualify or

3    if it's clear enough or not clear.

4          I understand you're saying, so long as it's

5    clear enough, that's good.  But I think I'm entitled

6    to ask you if a specific statement is clear enough or

7    not.  Okay?

8          So where on this document does it say what

9    you are saying?  Which is that it has to have specific

10   language and that it has to be clear enough.  Can you

11   show me, other than this add a 100-word statement, is

12   there anywhere else where it says that?

13      A.  I would say this is where it says that.  It

14   says if you want to add a 100-word statement to your

15   report.  So when a consumer writes in to us, they

16   would say "I want to add a statement to my report."

17      Q.  Okay.  Back up to TU 89.  In this section

18   here, if -- sometimes it would say something like

19   "consumer disputed this"; would that be the statement,

20   or is that something else that would be added in here?

21          MR. SAULS:  Objection, compound, ambiguous,

22   calls for speculation.

23          THE WITNESS:  Are we still talking about the

24   100-word statement?

25   BY MR. KIND:

Page 217

```
 1          Q.  No.  You answered that already.
 2          A.  Oh.
 3          Q.  That's down over here on TU 90.  And when you
 4   said there was nothing else other than that -- back up
 5   to TU 89.  Is there somewhere where NAF would be able
 6   to say that this is a disputed account, not the
 7   100-word statement, but specific to this account?
 8          MR. SAULS:  Objection, previously asked and
 9   answered.
10          THE WITNESS:  Yes, they can add that the
11   account is in dispute.
12   BY MR. KIND:
13          Q.  Okay.  And TransUnion can also add that
14   sometimes, that it's in dispute?
15          MR. SAULS:  Same objection.
16          THE WITNESS:  That -- that comment that the
17   account is in dispute comes directly from the data
18   furnisher.
19   BY MR. KIND:
20          Q.  Okay.  And the 100-word statement is
21   separate, it's not related to a specific account, it
22   would just be on the credit report; is that right?
23          MR. SAULS:  Objection, asked and answered.
24          THE WITNESS:  I think I said before that it
25   can be related to a specific account if the consumer
```

Page 218

1   includes that account in their statement.

2   BY MR. KIND:

3      Q.   Okay.  So now we're on TU 96.  This is --

4   down at the bottom, it's upside down, but it has one

5   of those DR numbers.  So can you verify that this is a

6   dispute letter that TransUnion received?

7      A.   Yes.

8      Q.   We're on TU 97.  Do you see the highlighted

9   portion that says, "Please include a statement on my

10  credit report stating that I dispute the above

11  information"?  Do you see that?

12     A.   Yes.

13     Q.   Is it your position that that is considered a

14  request for a 100-word statement or for any statement,

15  or is it your position that that's not a request to

16  include a statement that he disputes his account?

17          MR. SAULS:  Objection, vague, compound.

18          THE WITNESS:  In my opinion, that's not a

19  statement, because he doesn't specify what he wants us

20  to add.

21  BY MR. KIND:

22     Q.   What about the part where he says "Please

23  include a statement" -- dot dot dot -- "that I dispute

24  the above information"?

25          MR. SAULS:  Objection -- sorry, go ahead.

Page 219

CONFIDENTIAL

```
 1              THE WITNESS:  Okay.
 2              MR. SAULS:  I'm sorry, Mr. Kind, were you
 3     finished with your question?
 4              MR. KIND:  Yes.
 5              MR. SAULS:  Sorry.  Objection, calls for
 6     speculation, previously asked and answered, and vague.
 7              THE WITNESS:  And again, he doesn't specify
 8     what he wants to add.
 9     BY MR. KIND:
10         Q.  So your position, then, is that TransUnion
11     not including the statement in this case was not an
12     oversight, rather that it was following its procedures
13     and it was the correct thing to do according to
14     TransUnion procedures; is that correct?
15         A.  Yes.
16         Q.  And it has included the June 10 copy.  And
17     again you see on TU 99, again, "Please include a
18     statement on my credit report stating that I dispute
19     the above information."  And the question that I asked
20     before, you would have the same responses, correct?
21         A.  Correct.
22         Q.  Okay.  All right, we're on TU 117.  Can you
23     tell me what this is?
24              MR. SAULS:  Objection, calls for narrative.
25              THE WITNESS:  That's the internal disclosure
```

1   that was pulled on August 22nd, 2019.

2   BY MR. KIND:

3       Q.  And then on TU 120, do you see a section

4   called "Adverse Accounts"?

5       A.  Yes.

6       Q.  How many adverse accounts are appearing on

7   the plaintiff's credit report on this date?

8       A.  One.

9       Q.  And that's the New American Funding account,

10  correct?

11      A.  Yes.

12      Q.  And it's adverse because of that February

13  2018 late notation, correct?

14      A.  Yes.

15      Q.  Are there any other adverse notations on this

16  account?

17      A.  Can you blow it up a little bit?

18      Q.  So the question is, other than February 2018,

19  are there any other adverse notations on this account?

20          MR. SAULS:  Objection, beyond the scope of

21  the notice of the deposition.

22          THE WITNESS:  So I would say where it says

23  maximum delinquency is 30 days in February 2018,

24  there's another indication.

25  BY MR. KIND:

Page 221

1     Q.  Okay, anything other than February 2018?

2     A.  No.

3     Q.  All right.  We're on TU 130.  Could you tell

4  me what this document is?

5     A.  Yes, that's the cover page for a letter we

6  sent.

7     Q.  And this is similar to the letter that was

8  sent after the June 28th, 2019 dispute; is that right?

9     A.  That's correct.

10    Q.  All right.  Now we're on TU 133.  What is

11  this?

12    A.  That's an ACDV.

13    Q.  The general questions that I asked about the

14  other ACDV, the general fields about what's what, your

15  responses would be the same, correct?

16        MR. SAULS:  Objection, vague, compound,

17  beyond the scope of the notice of the deposition, asks

18  for a narrative.

19        THE WITNESS:  Can you repeat that, please.

20  BY MR. KIND:

21    Q.  Yeah.  So, for example, before I asked you

22  what is this date on the top right.  So your answer

23  would be the same, night?  Although the information

24  would be different, the date would be different;

25  payment pattern, I don't want to go through the whole

Page 222

1    prepared about the plaintiff in this case?

2         A.  Yes.

3         Q.  And I'm going to scroll down.  And this is

4    Bates -- it doesn't have Bates numbers.  So I'm going

5    to scroll down to Page 8 of 9 of -- which is

6    Exhibit 8.  And it has an inquiries section over here.

7    Can you confirm that "inquiries" mean that TransUnion

8    sent a credit report to a third party?

9              MR. SAULS:  Objection, beyond the scope of

10   the notice of the deposition.

11             THE WITNESS:  Yes.

12   BY MR. KIND:

13        Q.  Okay.  And then when it says "Requested

14   On" -- there's a bunch of them, but all of those dates

15   that it says "Requested On" specific date, then that's

16   the date that TransUnion sent it to the company that's

17   related to that request, right?

18             MR. SAULS:  Objection, beyond the scope of

19   the notice of the deposition.

20             THE WITNESS:  Yes.

21   BY MR. KIND:

22        Q.  So just as an example, it says here

23   "loanDepot," and then there is a date July 29th.  That

24   would be that on or about July 29th, TransUnion sent a

25   credit report to loanDepot, correct?

Page 244

1          MR. SAULS:  Objection, beyond the scope of

2      the notice of the deposition.

3          THE WITNESS:  Yes.

4      BY MR. KIND:

5          Q.  We reviewed the ACDVs in this case.  Are

6      there any -- did TransUnion receive any documents from

7      New American Funding at the time of these disputes and

8      at the time of receiving the responses to the ACDVs?

9          MR. SAULS:  Objection, vague.

10         THE WITNESS:  I really can't say, because

11     data services sent some automated transmissions.  I

12     don't know if they sent that to TransUnion.

13     BY MR. KIND:

14         Q.  You're saying "automated transmissions."  At

15     the time of responding to these ACDVs, they're able to

16     send documents?

17         MR. SAULS:  Objection, assumes facts not in

18     evidence, and ambiguous.

19         THE WITNESS:  Our furnishers can send

20     automated transmissions at any time before and after

21     ACDVs.

22     BY MR. KIND:

23         Q.  Are you aware that -- are you aware of --

24     from reviewing all of these documents and everything

25     we have been doing, are you aware of any documents

Page 245

1  that NAF sent to TransUnion together with the ACDV
2  response?
3          MR. SAULS:  Objection, ambiguous.
4          THE WITNESS:  No, not based on the documents
5  we looked at today.
6  BY MR. KIND:
7      Q.  Okay.  We discussed before that TransUnion
8  says that the reporting is accurate because he was in
9  fact 30 days late regardless of his claim that he
10  tried to make the payment.  Is that right?
11          MR. SAULS:  Objection to the extent it
12  misstates previous testimony.
13          THE WITNESS:  I think TransUnion's position
14  is that Mr. Tuttobene admits that he was 30 days late
15  and NAF also verifies that Mr. Tuttobene was 30 days
16  late.
17  BY MR. KIND:
18      Q.  Okay.  And that's why it's accurate, correct?
19      A.  Correct.
20      Q.  Okay.  And the comments about him trying to
21  make the payment, that does not change the fact that
22  it's accurate that he was 30 days late, correct?
23          MR. SAULS:  Objection, vague.
24          THE WITNESS:  I would have to say that is
25  correct.  He admitted he was 30 days late and the data

Page 246

CONFIDENTIAL

1          MR. SAULS:  Objection, compound, and vague

2    and ambiguous.

3          THE WITNESS:  I don't think TransUnion

4    considered him late in this situation.  I believe that

5    NAF considered him late and Mr. Tuttobene also

6    considered himself late.

7    BY MR. KIND:

8       Q.  Understood.  Let me say it a different way.

9    So the reason that Mr. Tuttobene gave for being late

10   doesn't change TransUnion's reporting the account as

11   30 days past due, correct?

12         MR. SAULS:  Objection, asked and answered.

13   BY MR. KIND:

14      Q.  Correct?

15      A.  So again, the reason he was late is between

16   him and NAF.  So he said he was late and NAF reported

17   that he was late, so to me there is no question about

18   the late payment.

19      Q.  Does TransUnion consider the reason why

20   someone is late in other contexts?

21         MR. SAULS:  Objection, vague, it calls for

22   speculation, beyond the scope of the notice of the

23   deposition.

24         THE WITNESS:  Well, TransUnion's position is

25   to report accurate and complete information.  In

1    Mr. Tuttobene's case, he did not provide TransUnion

2    any information or documentation that we could have

3    used to perform maintenance on his account.  We sent

4    that ACDV --

5    BY MR. KIND:

6         Q.  Objection, nonresponsive.  Let's just stick

7    to the question.

8              So the reason why he was late is not

9    something that TransUnion applies when deciding if

10   it's accurate to report 30 days or to remove that 30

11   days, correct?

12             MR. SAULS:  I'm going to object, and I'm

13   going to ask my client not to answer you.  You cut her

14   off and you stopped her answer.  She's given you her

15   answer to the question, whether you like it or not.

16   And I think the answer that she previously gave is

17   sufficient.

18             And you can object to nonresponsive, but I

19   think in that sequence my client now stopped her

20   answer, now you're asking her the question again

21   attempting to fish for a different answer.  So I would

22   ask her to not respond unless you want to ask a

23   different question or at least allow her to finish the

24   answer that she was giving before you cut her off.

25   BY MR. KIND:

Page 249

1    Q.  If TransUnion -- if plaintiff tried to make

2    the payment, but it was rejected because he had the

3    wrong account number, TransUnion's policy is not to

4    update his credit report to remove the 30 days,

5    correct?

6           MR. SAULS:  Objection, calls for speculation,

7    and vague, asked and answered.

8           THE WITNESS:  I would have to disagree.

9    BY MR. KIND:

10    Q.  Isn't that exact -- why do you disagree?

11           MR. SAULS:  Same objections.

12           THE WITNESS:  Because if there was

13    documentation to show that Mr. Tuttobene's dispute, we

14    would have updated the account based on his dispute,

15    we would have updated his account internally.

16    BY MR. KIND:

17    Q.  But didn't you say before that the way that

18    they were reported was correct, because he was in fact

19    30 days late?

20    A.  Yes, that is correct.

21    Q.  Okay.  So the fact that he put the wrong

22    account number and he tried, that doesn't change the

23    fact that what TransUnion is reporting correctly that

24    he was 30 days late, correct?

25           MR. SAULS:  Objection, ambiguous, compound,

Page 250

CONFIDENTIAL

1   asked and answered.

2        THE WITNESS:  So, again, Mr. Tuttobene

3   admitted that he was 30 days late, data furnisher

4   verified that he was 30 days late.  We didn't receive

5   any other indication that he was not 30 days late or

6   any other documentation so...

7   BY MR. KIND:

8        Q.  What about his reasoning for being late; does

9   that not change the result?

10        MR. SAULS:  Objection, asked and answered,

11   ambiguous, and leading, compound.

12        THE WITNESS:  I would say in this case the

13   reason for him being late would be between him and the

14   data furnisher.

15   BY MR. KIND:

16        Q.  What happens if the reason for him being late

17   was because NAF rejected his payment because they --

18   because of his religion?  They said, we're not

19   accepting your payment because of your religion.

20   Would that also be between him and the data furnisher?

21        MR. SAULS:  I'm going to object and I'm going

22   to -- you have five minutes left in your cross right

23   now.  Okay?  So I'm going to allow my client to answer

24   this question, but you have five minutes of cross as

25   we sit here today.  So I'm going to object to the

Page 251

CONFIDENTIAL

```
 1    relevancy of the question; I'm going to say asked and
 2    answered, compound, and ambiguous.
 3              You can answer, Ms. Kimp.
 4              THE WITNESS:  Okay.  Well, I'm not an
 5    attorney, but if his payment was rejected for
 6    religion, I would think that would fall under another
 7    type of legal -- legal problem.
 8    BY MR. KIND:
 9         Q.  Do you remember seeing a policy that says
10    that the reason that -- if they provide a reason for
11    being late, then we should look at what they say.  And
12    if it's because of religion, then we update, but if
13    it's because he got the wrong account number, we
14    don't?  Do you remember seeing a policy that says
15    that?
16              MR. SAULS:  Objection, assumes facts not in
17    evidence, misstates previous testimony, irrelevant,
18    compound, and ambiguous, beyond the scope of the
19    notice of the deposition.
20    BY MR. KIND:
21         Q.  You can answer.
22         A.  No, I don't remember seeing that.
23         Q.  Yeah.  And to go back to what you said, if
24    the reason they rejected it is because of religion,
25    let's say because of his race, in that case you would
```

Page 252

1    agree that maybe there's some legal -- there's

2    something else.  Do you agree with that?

3              MR. SAULS:  Same objection.

4              THE WITNESS:  Yes, I would agree that that's

5    something else.

6    BY MR. KIND:

7        Q.  Okay.  And in that case, the 30 days probably

8    should be removed, correct?

9              MR. SAULS:  Objection, ambiguous, and vague,

10   and beyond the scope of the notice of the deposition,

11   calls for speculation.

12   BY MR. KIND:

13       Q.  Do you agree with that?

14       A.  Yes, if they're reporting 30 days late only

15   because of his religion and nothing else, then I would

16   agree that that would be incorrect.

17             MR. SAULS:  Mr. Kind, you've got about three

18   minutes of cross-examination, do you want continue

19   your direct.  Excuse me, three minutes of redirect.

20   Do you want to continue your direct?

21             MR. KIND:  Hold on a second.

22       Q.  And in that case of religion or race, the

23   reason why that should be updated is because the

24   reason why someone misses a payment is relevant to

25   whether it's accurate or not, do you agree?

Page 253

CONFIDENTIAL

1        MR. SAULS:  Objection, calls for speculation,

2   leading, ambiguous, and beyond the scope of the notice

3   of the deposition, and compound.

4        THE WITNESS:  Can you repeat the question?

5   BY MR. KIND:

6        Q.  Yeah.  So you said that if it was because of

7   race or religion, in that case it should be updated.

8   So I'm basically asking you if you agree that the

9   reason for that is because the justification for being

10  late is important to the question of being accurate or

11  not.

12        MR. SAULS:  Objection, calls for speculation,

13  asked and answered, leading, irrelevant, and beyond

14  the scope of the notice of the deposition.

15        THE WITNESS:  Well, I would say, in a case of

16  race, religion, sex, I think that's something totally

17  different than what we're dealing with right now with

18  Mr. Tuttobene's dispute.

19        MR. KIND:  Okay.  I have no further questions

20  for right now.  But for the record, I went 20 minutes

21  exactly and I still have five minutes for rebuttal.

22        MR. SAULS:  We'll go off the record.  I

23  disagree with that.  We'll go off the record.

24        MR. KIND:  I was timing.  I was 20 minutes.

25        MR. SAULS:  Okay.  We started this at 12:00

Page 254

1   p.m. Central, it's now 8:30 p.m. Central; we've had

2   approximately an hour and a half of breaks.

3          I will stand on my reasoning, Mr. Kind.  You

4   can file the appropriate motion.  We're done.  We're

5   going to take a ten-minute break, and we will be back

6   in ten minutes.  We can go off the record.

7          MR. KIND:  Wait, before we go off the record,

8   are you saying that I'm not going to be able to take

9   the five minutes that we agreed to?

10          MR. SAULS:  Let's take it up when we get

11   back, please, at this point.  We're talking about

12   religion and if religion would keep TransUnion from

13   disputing an account.  I need to get off the record

14   because I need to get my client done.  We can pick it

15   up when we come back on the record, sir.

16          MR. KIND:  Sure.  And I'll have five minutes

17   of rebuttal.

18          MR. SAULS:  We are off the record.  Thank

19   you.

20          (Recess taken.)

21                    EXAMINATION

22   BY MR. SAULS:

23       Q.  We are back on the record.  This is

24   TransUnion's cross-examination.  And Ms. Kimp, you

25   realize that at this point that you are still under

Page 255

CONFIDENTIAL

```
 1                    REPORTER'S DECLARATION

 2    STATE OF NEVADA        )

                            )   s:

 3    COUNTY OF CLARK        )

 4           I, Michelle C. Johnson, CCR 771, declare as

 5    follows:

 6           That I reported virtually the taking of the

 7    deposition of the witness, NIKISHA KIMP, commencing on

 8    Thursday, August 27, 2020 at 10:05 a.m.

 9           That prior to being examined, the witness was

10    by me virtually duly sworn to testify to the truth,

11    the whole truth, and nothing but the truth.

12           That I simultaneously transcribed my said

13    shorthand notes into typewriting via computer-aided

14    transcription, and that the typewritten transcript of

15    said deposition is a complete, true, and accurate

16    transcription of said shorthand notes taken down at

17    said time.  That prior to completion of the

18    proceedings, review of the transcript pursuant to

19    FRCP 30(e) was not requested.

20           I further declare that I am not a relative or

21    employee of any party involved in said action, nor a

22    person financially interested in the action.

23           Dated:  September 14, 2020.

24
                    Michelle C. Johnson

25           Michelle C. Johnson, RPR-CRR, CCR No. 771
```

Page 301

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.